UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIANCA TAMIKA MONIQUE NEALY,

    Plaintiff,                           Civil Action No. 15-10414

       v.                          District Judge LAURIE J. MICHELSON
                                    Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Bianca Tamika Monique Nealy ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On March 16, 2012, Plaintiff applied for DIB and SSI, alleging disability as of January 1, 2011 (Tr. 120, 128). Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on May 15, 2013 in Oak Park, Michigan (Tr. 25). Patricia S. McKay, Administrative Law Judge ("ALJ") presided. Plaintiff, unrepresented, testified (Tr. 32-57, 59-61), as did Vocational Expert ("VE") James Rosco (Tr. 57-59, 61-65). On September 26, 2013, ALJ McKay found Plaintiff not disabled (Tr. 14-21). On December 5, 2014, the Appeals Council denied review (Tr. 1-3). Plaintiff filed suit in this Court on January 30, 2015.

## BACKGROUND FACTS

Plaintiff, born December 15, 1978, was 34 when ALJ McKay issued her decision (Tr. 21, 120). She left school after 11th grade and received training as a medical biller (Tr. 194). Her application for benefits states that she worked previously as a fast food worker, day care provider, inspector, machine operator, and medical biller (Tr. 194). She alleges disability as a result of sarcoidosis,[1] headaches, and backaches (Tr. 193).

A.   **Plaintiff's Testimony**

Plaintiff offered the following testimony.

---

[1] Sarcoidosis is an inflammatory disease which typically affects the lungs and lymph glands. Symptoms may include a "dry cough," fatigue, swollen joints, and "reddish bumps or patches on the skin. http://www.webmd.com/lung/arthritis-sarcoidosis (last visited, February 9, 2016).

She lived with her husband and two-year-old son in a two-story house in Detroit, Michigan (Tr. 38). She was right-handed, stood 5' 7" and weighed 230 pounds (Tr. 39). She slept on the second floor of the house and performed laundry chores in the basement (Tr. 39-40). She refrained from getting a GED due to her fear of failure and the cost of classes (Tr. 40). She received training in medical billing in June, 2005 (Tr. 41).

Plaintiff worked in customer service for Ticketmaster for a brief period in 1999 (Tr. 41). After the Ticketmaster position ended, she worked for two years as a crew member at a Burger King restaurant (Tr. 42). She also worked briefly as a dishwasher and as a cashier (Tr. 43-44). In 2010, she earned $12,000 as a self-employed daycare specialist (Tr. 44). She now only had one daycare client, noting that her current income was $52 every two weeks (Tr. 48). Her daycare work involved feeding and changing children ranging from a newborn to a three-year-old (Tr. 49). She corrected her earlier testimony that she was still working, stating that at present, she did not take care of any children except her own son (Tr. 49). She currently supported herself with a "stipend" and her husband's disability payments (Tr. 50). She had not held a license since having a car accident in 2002, but still drove and in fact, had driven herself to the hearing (Tr. 50).

On some days, she woke up with a headache, but arose anyway to care for her son (Tr. 51). On other days, she was unable to get out of bed until 11:00 a.m. or later (Tr. 52). Her abilities were limited by sarcoidosis, back aches, headaches, and Carpal Tunnel Syndrome ("CTS") (Tr. 52). She had been using a right wrist splint for some time and recently, also

required a left wrist splint (Tr. 52). She attributed her back problems to the 2002 car accident (Tr. 53). She had attended physical therapy but stopped going after losing her insurance (Tr. 53). Prescribed medication did not help her back condition (Tr. 54).

Plaintiff had not received mental health treatment but experienced depression resulting from the chronic headaches (Tr. 54-55). The headaches caused sleep disturbances, created difficulty performing household chores, and prevented her from playing outside with her son for extended periods (Tr. 55). She did not experience medication side effects (Tr. 56). She was unable to lift more than 10 pounds (Tr. 56). She did not smoke or use alcohol or drugs (Tr. 57). She did not require the use of a cane or walker (Tr. 57). She was not able to work due to headaches, back problems, and occasional "chest problems due to . . . sarcoidosis" (Tr. 57).

### B.   Medical Evidence

#### 1.   Treating Sources

August, 2010 intake records by Advantage Health Care Center note Plaintiff's report of headaches and a history of sarcoidosis (Tr. 243). In November, 2010, Plaintiff reported that the condition of sarcoidosis had improved (Tr. 241). Plaintiff reported that in September, 2010, she was admitted to the hospital for migraines and a suspected heart attack (Tr. 240). December, 2010 treating records state that the condition of sarcoidosis was "stable" and that the migraines were "unchanged" (Tr. 239). The same month, treating records by Oakland Primary Care state that Plaintiff was prescribed prednisone and the use

of an inhaler, as needed for sarcoidosis (Tr. 253, 329).  Plaintiff exhibited an appropriate mood and affect (Tr. 253, 329).

February, 2011 records by Oakland Primary Care state that Plaintiff exhibited a "normal respiratory effort" (Tr. 250).  Plaintiff reported that she was unable to afford a recommended CT of the chest for diagnosis of a "lung mass" (Tr. 250).  February and April, 2011 treating notes state a diagnosis of "classical migraine without intractable migraine" (Tr. 249).  In April, 2011, Plaintiff reported that her "pain ha[d] improved since the last visit" and was now "less frequent and less severe" (Tr. 249, 325).

August, 2011 records by Pamela Berry Williams, M.D. note Plaintiff's report of headaches "all the time" lasting between two days to a week (Tr. 278).  A CT of the brain was normal, but a neck x-ray revealed muscle spasms possibly contributing to the headaches (Tr. 307, 330-331).  A chest x-ray showed "mild chronic changes with some scarring" but "no definite evidence of active disease" (Tr. 307, 332).  The same month, Dr. Williams completed a "Physician's Statement for Adoption," noting that Plaintiff currently took medication for sarcoidosis and migraine headaches (Tr. 321-322).  September, 2011 treating notes by Dr. Williams state that lungs were clear to auscultation with "non-labored" respiration (Tr. 276).  Plaintiff reported that her headaches were "doing better" until two days before the appointment (Tr. 282).  The following month, she reported continuing headaches (Tr. 285).  A CT of the mastoids and inner ears was unremarkable (Tr. 310, 316-317).

Dr. Williams' January, 2012 treating records note normal respiration (Tr. 292).

Plaintiff reported chest pain (Tr. 292). The following month, Plaintiff reported that headache medicine helped somewhat but did not relieve a "bad" headache (Tr. 294). March, 2012 treating records note normal respiration (Tr. 298). A chest x-ray from the following month was negative for masses or infection (Tr. 312). Plaintiff sought emergency treatment in July, 2012 for abdominal pain after someone "sat on her" (Tr. 345). She also reported a headache (Tr. 345). A chest x-ray was unremarkable (Tr. 350).

In February, 2013, Plaintiff sought emergency treatment for abdominal pain (Tr. 335). She was diagnosed with "possible gastritis" and discharged (Tr. 336). Imaging studies were negative for abnormalities (Tr. 340-341). An EKG and blood tests were normal (Tr. 346, 351-353). She was discharged in stable condition (Tr. 346).

### 2. Non-Treating Sources

In April, 2011 Ernesto Bedia, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report that "moving around the house, cleaning, vacuuming and mopping" created shortness of breath due to asthma (Tr. 255). Plaintiff reported that the use of an inhaler resolved the shortness of breath within five minutes (Tr. 255). Plaintiff denied being hospitalized for asthma (Tr. 255). She reported that walking more than half a mile and performing heavier household chores created back pain (Tr. 255). She reported experiencing migraines approximately six times a month for up to three days at a time (Tr. 256). She denied receiving an MRI or CT scan of the head (Tr. 255).

Dr. Bedia noted no respiratory distress or wheezes (Tr. 257). Plaintiff exhibited a

stable gait and a full range of back motion (Tr. 257, 263-264). She did not exhibit manipulative limitations (Tr. 257, 265). Reflexes were normal (Tr. 265). Dr. Bedia found that Plaintiff did not require a walking aid (Tr. 266).

In June, 2012, Stephen E. Wood, M.D. performed a non-examining review of Plaintiff's treating and consultative records on behalf of the SSA, finding that she could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for a total of six hours in an eight-hour workday; and was required to avoid concentrated exposure to "fumes, odors, dusts, gases [and] poor ventilation" (Tr. 72-73, 76).

### D. Vocational Expert Testimony

VE Michael Rosco found that although Plaintiff held several jobs, the only job that amounted to substantial gainful activity ("SGA") was the job of child monitor (Tr. 61). He classified the job of child monitor as semiskilled and exertionally medium[2] (Tr. 230). ALJ McKay then posed the following question to the VE, describing an individual of Plaintiff's age, education, and work experience with the following limitations:

---

[2] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

> [S]he would have the residual functional capacity to perform the full range of sedentary exertional work, but she has some additional limitations. This person can only occasionally climb stairs, climb ladders, crouch, crawl, kneel, stoop, bend. She needs to avoid pulmonary irritants and the work should be simple, routine and repetitive. With those limitations would that hypothetical person be able to perform [Plaintiff's] past work (Tr. 62)?

The VE testified that the above limitations would preclude Plaintiff's past work as a child monitor but would allow for the sedentary, unskilled work of an assembler or inspector/sorter, noting that approximately 2,000 positions existed in southeastern Michigan (Tr. 62). The VE testified further that if the same individual were also limited by the need to "avoid using power or vibrating tools," the job findings would remain unchanged (Tr. 62-63). However, the VE stated that if the individual required "frequent, unscheduled" work breaks throughout the day, or, the need to miss more than two days of work each month, all unskilled work would be eliminated (Tr. 63). The VE stated that if Plaintiff's testimony were fully credited, she would be unable to perform any work (Tr. 64). He stated that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") and *Selected Characteristics of Occupations* ("SCO") (Tr. 64).

### D. The ALJ's Decision

Citing Plaintiff's medical records, ALJ McKay found the severe impairments of "history of sarcoidosis of the lung, asthma, obesity, migraines with temporomandibular joint dysfunction ("TMJ") and cholesteatoma of the right ear, ventral hernia and enlarged spleen" but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16-17). She found that the conditions of "otitis media,

CTS, and lower back pain were "non-severe" (Tr. 17).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for sedentary work with the following additional limitations:

> [she] can occasionally climb stairs and ladders, and can occasionally crouch, crawl, kneel, stoop, and bend. The claimant must avoid continuous exposure to pulmonary irritants. She is limited to simple, routine, and repetitive work (Tr. 18).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to return to her past work as a child monitor, she could perform the jobs of assembler and inspector/sorter (Tr. 20-21, 62).

The ALJ found that the medical records did not support Plaintiff's claim of disabling respiratory difficulties (Tr. 18). She cited pulmonary function testing showed only "moderate" airway obstruction (Tr. 18). She noted that Plaintiff responded "very well to inhaler usage" (Tr. 19). The ALJ noted that the medical records supported the finding that Plaintiff could perform exertionally light work, but nonetheless reduced the RFC to sedentary work "because it reflects the probable fact that six plus hours on her feet would cause an exacerbation of . . . symptoms" (Tr. 19). The ALJ noted that the objective evidence did not support Plaintiff's claim of disabling headaches (Tr. 19). She noted that "the record does not contain much in terms of treatment for headaches or records of emergency room visits . . ." (Tr. 19). The ALJ found in general that Plaintiff's professed degree of limitation was "largely inconsistent with what the objective evidence suggests in terms of functional restriction" (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984)

## ANALYSIS

### A. The ALJ's Duty to Develop the Record

Plaintiff, noting that she was unrepresented by counsel at the hearing, argues that the ALJ did not fulfill the duty to develop the record. *Plaintiff's Brief,* 10-13, *Docket #17.* Plaintiff argues that a "heightened duty" existed given her *pro se* status at the hearing and her 11th grade education. *Id.* at 10-11(citing *Lashley v. Secretary of Health and Human Services* 708 F.2d 1048, 1051 (6th Cir.1983)). Plaintiff acknowledges that the ALJ ordered additional medical records following the hearing and that each request for records was denied. *Id.* at 11. She nonetheless appears to argue that the record requests were denied because they "sought records for a period well after the time in which [P]laintiff saw the

doctors in question . . ." *Id.* (*citing* Tr. 356-358). Plaintiff also criticizes the ALJ for failing to develop the record as to the alleged mental health problems, citing her testimony of depression resulting from the physical problems. *Id.* at 12 (*citing* Tr. 54-55).

Plaintiff is correct that while an ALJ cannot properly assume the role of counsel, "[she] acts as an examiner charged with developing the facts." *Lashley v. Secretary of Health and Human Services* 708 F.2d 1048, 1051 (6th Cir.1983); *Richardson v. Perales,* 402 U.S. 389, 411 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971). Where a claimant is unrepresented at the hearing, "the ALJ has a duty to exercise a *heightened* level of care and assume a more active role" in the proceedings. *Lashley* at 1051(*citing Smith v. Harris,* 644 F.2d 985, 989 (3d Cir.1981))(emphasis added).

The transcript does not support Plaintiff's argument that the ALJ failed to exercise a heightened duty of care. The ALJ prefaced the hearing testimony by advising Plaintiff at length of her right to obtain counsel or proceed unrepresented (Tr. 30). The ALJ stated that her office "would . . . obtain the relevant medical and non-medical records" following the hearing (Tr. 30). The ALJ stated at the end of hearing that she would leave "the record open to update" the medical records (Tr. 65). However, transcript pages 355-362 indicate that the post-hearing requests for additional transcripts were denied.

While Plaintiff appears to fault the ALJ for erroneously requesting records for a period post-dating treatment, the requests for Karen A. Heidelberg, M.D.'s records were made for January 1, 2011 forward (Tr. 356). Given that Plaintiff did not allege disability

until January 1, 2011, records predating that date would at best provide only background into Plaintiff's condition rather than support her contention that she was disabled from 2011 forward. But more to the point, Dr. Heidelberg did not check the box stating that she had not treated Plaintiff "for time period requested," but rather, checked the box stating that she had "*no information on this patient*" (Tr. 356)(emphasis added). The response to requests to Woodland Urgent Care for records from July 27, 2012 forward state that the facility had "no record of [Plaintiff]" (Tr. 357). Likewise, a request for the records of Midwest Medical Center, made for the period from January 11, 2011 forward, received the response that Plaintiff was "not a patient at" (Tr. 358). The response to the request for information from St. John Macomb - Oakland Hospital Macomb Center states that "Patient was not seen at this facility"[3] (Tr. 362). The record shows that the ALJ conducted a diligent search, despite the fact that a number of entities where Plaintiff claimed to have received treatment denied that she had been a patient.

Plaintiff also asserts that after promising to leave the record open for 30 days, "the ALJ simply proceeded to decision without bothering to obtain the records in question." *Plaintiff's Brief* at 11. In fact, the ALJ refrained from issuing a determination until over four months following the hearing and long after the requests for medical records had been denied

---

[3] I note that in November, 2010, Plaintiff reported to a treater that she was admitted to the hospital for migraines and a suspected heart attack the previous September (Tr. 240). While the evidence does not include any September, 2010 hospital records, Plaintiff does not allege disability before January 1, 2011. Therefore, if the records indeed exist, they have little, if any, relevance to the claim for benefits.

(Tr. 21, 25). Plaintiff's claim that her case has been compromised by the failure to procure the records is particularly specious, given that she is now represented by counsel who was fully capable of obtaining the missing records and filing a motion for a remand pursuant to the sixth sentence of 42 U.S.C. 405(g) as appropriate for consideration of newer evidence. Plaintiff's attorney has not only failed to procure the newer records, but does not argue that the "missing" records would have had any bearing on the ALJ's decision.

Moreover, the existing records, showing that Plaintiff received occasional and non-aggressive treatment for her conditions, are consistent with her testimony that her conditions did not prevent her from performing household chores, caring for a two-year-old, or driving. Where the existing records provide more than adequate grounds for determination, the ALJ is not required to "ferret out" additional records that the claimant neglected to procure. *Nabours v. Commissioner of Social Sec.,* 50 Fed.Appx. 272, 275, 2002 WL 31473794, *2 (6th Cir.2002). *See Boyes v. Secretary of Health and Human Services* 46 F.3d 510, 512 (6th Cir.1994); accord *Halsey v. Richardson,* 441 F.2d 1230 (6th Cir.1971)("Claimant bears the burden of proving his entitlement to benefits"); 20 C.F.R. § 404.1512(a).

Plaintiff also argues that the ALJ had a duty to further investigate her testimony that she needed mental health treatment for depression. *Plaintiff's Brief* at 11-12 (*citing* Tr. 54-55). She cites 20 C.F.R. § 404.1529(b), which states that the ALJ "will develop evidence regarding the possibility of a medically determinable mental impairment when we have information to suggest that such an impairment exists . . ." Plaintiff argues that the ALJ was

-14-

required to obtain a consultative opinion regarding her alleged psychological problems.

However, the hearing transcript does not support the need for further investigation. After alleging that she experienced depression, she clarified that it was "depressing" to experience physical health problems (Tr. 55-56). Her testimony that her physical symptoms were dispiriting, with nothing more, did not require the ALJ to order a consultative examination. Plaintiff did not allege that her "depression" created functional limitations (Tr. 55-56). Moreover, while Plaintiff regularly sought treatment and medication for migraines and sarcoidosis, the treating and consultative records indicate that she did not allege depression or request psychotropic medication. The treating records contain no indication of a mood disorder or an inappropriate affect (Tr. 252, 329, 337).

### B. The Credibility Determination

Plaintiff also takes issue with the ALJ's credibility determination. *Plaintiff's Brief* at 13-15. She contends that the ALJ did not address the alleged limitations as a result of occasional chest pain due to sarcoidosis. *Id* at 13 (*citing* Tr. 57). She also argues that the ALJ erroneously concluded that sarcoidosis was exacerbated by activity. *Id.*

Plaintiff does not argue that the ALJ failed to abide by the procedural requirements of the credibility determination as set forth in SSR 96-7p, 1996 WL 374186 *2 (July 2, 1996) but rather, that the determination is based on an erroneous interpretation of the medical records. She suggests that the ALJ did not address the allegations that chest pain from sarcoidosis was disabling. She contends that the limitation to sedentary work did not address

the limitations caused by sarcoidosis.

Neither contention provides grounds for remand. First, the ALJ acknowledged Plaintiff's allegations of chest pain resulting from sarcoidosis (Tr. 18), but permissibly found that the medical transcript, including the objective studies and "physical status examinations," did not support the professed degree of limitation (Tr. 18-19). The ALJ cited February and August, 2011 treating records showing that Plaintiff was in no acute distress and did not exhibit lung problems (Tr. 19, 252, 279). August, 2011 imaging studies show "few scar-like densities" and "no definite evidence of active disease in the chest" and the April and July, 2012 chest x-rays show unremarkable results (Tr. 312, 332, 350). Likewise, neither the treating records nor Plaintiff's testimony support the claim that chest pain from sarcoidosis prevented her from performing the limited range of sedentary work set forth in the RFC. Plaintiff reported the chest pain on an occasional basis only (Tr. 57). Her claim that the ALJ did not adequately address the condition of "chest pain" caused by sarcoidosis is unavailing.

Second, while she criticizes the ALJ's finding that *both* the sarcoidosis and asthma conditions were worsened "with exertion," she does not explain how the result would change if the ALJ instead found that only the asthma condition was worsened upon exertion (Tr. 19). The ALJ's finding that Plaintiff experienced shortness of breath appears to be based on Plaintiff's report to Dr. Bedia in April, 2011 that "moving around the house, cleaning, vacuuming and mopping" created shortness of breath (Tr. 19, 255). As discussed above, the

ALJ also addressed the alleged limitations created by sarcoidosis-created chest pain (Tr. 18). Notably, Plaintiff's present contention that the chest pain due to sarcoidosis was not "worse with activity," based a single treating record, is not found elsewhere in the medical transcript (Tr. 251).

Plaintiff also disputes the ALJ's finding that "the record does not contain much in terms of treatment for headaches, or records of emergency room visits because of these symptoms," noting that the lack of aggressive treatment suggested "a somewhat minimally invasive impairment." *Plaintiff's Brief* at 14 (*citing* Tr. 19). She asserts that she reported "intractable" migraine headaches, first in February, 2011 and again in August and September, 2011 and February, March, and May, 2012. *Id.* at 15. She disputes the ALJ's finding that a restriction to "simple, routine work" adequately accounted for the limitations caused by headaches. *Id.*

The ALJ's findings regarding the migraine headaches do not provide grounds for remand. First, the February, 2011 treating records state a diagnosis of "classic migraine *without* intractable migraine" (Tr. 251)(emphasis added). Further, while Plaintiff took prescription medication for the headaches and sought treatment periodically, the ALJ correctly noted that a CT of the head did not support Plaintiff's alleged degree of limitation (Tr. 19, 307, 331). While a neck x-ray suggested that muscle spasms contributed to the

headaches, Plaintiff reported generally good results from medication[4] (Tr. 282, 331). The ALJ noted correctly that Plaintiff had not sought emergency room treatment or emergency treatment from her own physicians (Tr. 19). While Plaintiff points out that she reported headaches at the time she sought emergency treatment in July, 2012, the emergency visit does not appear to be precipitated by headaches but rather, her concern that she had injured her spleen after "someone sat on her" (Tr. 345).

Because the ALJ's credibility determination is well supported and adequately articulated, a remand is not warranted. While "subjective complaints of a claimant can support a claim for disability[] if there is also evidence of an underlying medical condition in the record," the ALJ may reject a claimant's professed degree of limitation, provided his conclusions are supported by substantial evidence. *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). The ALJ did not err in finding that the headaches were accounted for with a limitation to "simple, routine" work (Tr. 19).

My recommendation to uphold the Commissioner's determination should not be read to trivialize her limitations as a result of various conditions. Nonetheless, the ALJ's finding that Plaintiff was capable of a limited range of sedentary work is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level. As such, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

---

[4]The August, 2011 records indicate that the headaches did not prevent her from proceeding with the adoption of her son (Tr. 321-322).

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                                                 s/ R. Steven Whalen
                                                                                 R. STEVEN WHALEN
                                                                                 UNITED STATES MAGISTRATE JUDGE

Dated: February 12, 2016

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 12, 2016, electronically and/or by U.S. mail.

                                                                                s/Carolyn M. Ciesla
                                                                                Case Manager to the
                                                                                Honorable R. Steven Whalen